1   Dan Stormer, Esq. [S.B. # 101967]
2   Josh Piovia-Scott, Esq. [S.B. #222364]
    Mohammad Tajsar, Esq. [S.B. #280152]
3   HADSELL STORMER & RENICK LLP
    128 N. Fair Oaks Avenue
4   Pasadena, California 91103
    Telephone: (626) 585-9600
5   Facsimile:  (626) 577-7079
    Emails: dstormer@hadsellstormer.com
6           jps@hadsellstormer.com
            mtajsar@hadsellstormer.com
7
8   Lori Rifkin, Esq. [S.B. # 244081]
    RIFKIN LAW OFFICE
9   P.O. Box 19169
    Oakland, California 94619
10  Telephone: (415) 685-3591
    Email: lrifkin@rifkinlawoffice.com
11
12  Attorneys for Plaintiffs

13              **UNITED STATES DISTRICT COURT**
14              **NORTHERN DISTRICT OF CALIFORNIA**

15  Estate of JACOB PARENTI, deceased,    | CASE NO:
    by and through MATTHEW
16  OBERHOLTZ; D.P-O., a minor, by        | **COMPLAINT FOR DAMAGES**
    and through his guardian, MATTHEW
17  OBERHOLTZ; and SUSAN                  | 1. Failure To Provide Medical Care In
    PARENTI,                              |    Violation Of Eighth And Fourteenth
18                                        |    Amendments (42 U.S.C. § 1983);
                Plaintiffs,               | 2. Deprivation Of Substantive Due
19                                        |    Process In Violation Of First And
    vs.                                   |    Fourteenth Amendments (42 U.S.C. §
20                                        |    1983);
    COUNTY OF MONTEREY;                   | 3. Failure To Furnish Medical Care (42
21  SHERIFF SCOTT MILLER, in his          |    U.S.C. § 1983); ;
    official and individual capacities;   | 4. Negligent Supervision, Training,
22  OFFICER COLLINS, in his individual    |    Hiring, And Retention;
    capacity; CALIFORNIA FORENSIC         | 5. Negligence; and
23  MEDICAL GROUP; and DR.                | 6. Wrongful Death.
    TAYLOR FITHIAN,
24                                        |
                Defendants.               | **DEMAND FOR JURY TRIAL**
25
26
27
28

COMPLAINT FOR DAMAGES

**INTRODUCTION**

1.      On January 15, 2014, Defendants left Jacob Parenti, a 33 year-old man in Monterey County Jail for a probation violation, lying unconscious, helpless, and untreated on his dorm bed to die.  Through this lawsuit, Plaintiffs seek to hold Defendants accountable for refusing to provide basic health care to Mr. Parenti, resulting in his death.

2.      At the time of Jacob Parenti's death in January 2014, the Jail was already the subject of a federal putative class action lawsuit regarding systemic failures to provide adequate medical and mental health care, resulting in unnecessary harm, suffering, and death.  However, the County, its Sheriff and officers have stubbornly refused to address these known issues and to adopt policies, procedures, and practices to provide minimum standards of treatment for inmates.

**JURISDICTION**

3.      This Complaint seeks damages for the violation of the civil rights, privileges, and immunities guaranteed by the First, Eighth, and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988, as well as for violations of California state law.

4.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343.

5.      This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, because the claims form part of the same case or controversy arising under the United States Constitution and federal law.

**VENUE**

6.      Plaintiffs' claims, alleged herein, arose in the County of Monterey, California. Venue therefore lies in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2).

7.      Rule 3 of the Federal Rules of Civil Procedure and Local Rule 3-2(e) authorizes assignment to this division because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the counties served by this division.

## PARTIES

8.      Plaintiff D.P-O. is the seven year-old minor son and sole heir of Jacob Parenti.  Plaintiff D.P-O. brings his individual claims by and through Matthew Oberholtz, his legal guardian. They reside in Butte County, California.

9.      Plaintiff D.P-O. also brings claims on behalf of the Estate of Jacob Parenti, by and through his legal guardian Matthew Oberholtz, pursuant to California Code of Civil Procedure §§ 377.10 et seq. At the time of his death, Jacob Parenti was a 33 year-old citizen of the United States and resident of the County of Monterey in the State of California.  The survival causes of action in this matter are based on violations of Jacob Parenti's rights under the U.S. Constitution and California state law.

10.      Plaintiff Susan Parenti is the mother of Jacob Parenti, and resides in Monterey County, California. She is suing individually for violations of civil rights under the First and Fourteenth Amendments and California state law.

11.      Defendant County of Monterey is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of Monterey operates and manages Monterey County Jail and is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of the Monterey County Sheriff's Office and Monterey County Jail, and each entity's respective employees and/or agents. Monterey County Sheriff's Office operates Monterey County Jail, and is and was responsible for ensuring the provision of emergency and medical and mental health care services to all Monterey County Jail inmates.  Monterey County Sheriff's Office also operates the Office of the Coroner.

12.     Defendant Scott Miller is, and was at all relevant times mentioned herein, the Sheriff-Coroner of the County of Monterey, the highest position in the Monterey County Sheriff's Office. As Sheriff-Coroner, Defendant Miller is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all Monterey County Sheriff's Office custodial employees and/or agents. Defendant Miller is and was charged by law with the administration of the Monterey County Jail, and is responsible for safety and security of inmates housed at the Jail. Defendant Miller also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Monterey County Sheriff's Office alleged herein were committed. As Sheriff-Coroner, Defendant Miller is also charged with oversight of the Coroner's Division of the Monterey County Sheriff's Office. Defendant Miller is being sued in his individual and official capacities.

13.     Defendant Collins is, and was at all relevant times mentioned herein, an officer in the Monterey County Sheriff's Office. While on shift at the Jail, he was and is responsible for the safety and security of inmates including inmates in his assigned wing(s). On January 15, 2014, Defendant Collins was on duty at the Monterey County Jail and participated in announcing inmates in D-wing for sick call, including Jacob Parenti. When Mr. Parenti did not respond for sick call, Defendant Collins entered the dorm and walked to Mr. Parenti's bunk. Defendant Collins unsuccessfully attempted to rouse Mr. Parenti verbally and physically. Despite Mr. Parenti's clear inability to respond, and a clear need for emergency medical treatment, after this attempt, Defendant Collins simply left the dormitory and did not provide or summon assistance for Mr. Parenti.

14.     Defendant California Forensic Medical Group ("CFMG") is a California corporation headquartered based in Monterey, California. CFMG is a private for-profit correctional health care provider that services approximately 65

1   correctional facilities in 27 California counties.  The County of Monterey contracts

2   with CFMG to provide medical, mental health, and dental services for the Monterey

3   County Jail.  The Institute for Medical Quality (IMQ) declined to certify CFMG's

4   services at the Monterey County Jail, and IMQ has accredited only 9 of CFMG's

5   approximately 65 facilities in California.  At all times relevant herein, CFMG was

6   responsible for the health services provided to Jacob Parenti during his detention in

7   the Monterey County Jail.

8        15.    Defendant Taylor Fithian is, and was at all relevant times mentioned

9   herein, the co-founder, President, and Medical Director for Defendant CFMG.

10   Defendant Fithian is a Board-certified psychiatrist and oversees the delivery of

11   medical, mental health and dental care in all CFMG-served facilities, including

12   standards of medical care and utilization review. Defendant Fithian is and was

13   responsible for the promulgation of the policies and procedures and allowance of

14   the practices/customs pursuant to which the acts of California Forensic Medical

15   Group alleged herein were committed. In addition, Defendant Fithian personally

16   provides health services at Monterey County Jail.  Defendant Fithian is sued in his

17   individual capacity.

18        16.    Defendants Miller, Collins, and Fithian engaged in the acts or

19   omissions described herein under color of state law.

20        17.    Plaintiffs are informed and believe and thereon allege that at all times

21   mentioned in this Complaint, Defendants, and each of them, were the agents,

22   employees, servants, joint venturers, partners and/or co-conspirators of the other

23   Defendants named in this Complaint and that at all times, each of the Defendants

24   was acting within the course and scope of said relationship with Defendants.

### EXHUASTION OF PRE-LAWSUIT PROCEDURES FOR STATE LAW CLAIMS

25

26

27        18.    Plaintiffs filed governmental tort claims with Defendant County of

28   Monterey on behalf of the Estate of Jacob Parenti, Susan Parenti, and D.P-O. on

COMPLAINT FOR DAMAGES    -4-

July 3, 2014.  By correspondence dated August 7, 2014, the County of Monterey rejected the governmental tort claims.

**FACTUAL ALLEGATIONS**

**I.      History of Inadequate Medical Care in Monterey County Jail**

19.     County of Monterey, Monterey County Sheriff's Office, CFMG, and Taylor Fithian have been on notice that their provision of medical care to inmates at the Monterey County Jail is inadequate and results in needless harm and suffering since at least 2007, when the Monterey County Sheriff's Office and the Monterey County Board of Supervisors hired an outside consulting firm to perform a needs assessment for the Jail. (See Ex. 1.) The 2007 Assessment concluded that the Jail was severely overcrowded, lacked adequate numbers of staff, and that "medical/mental health treatment spaces are not adequate for the rated beds, let alone the actual number of inmates held." (Ex. 1 at 1, Executive Summary at 1.)  It further concluded that shortfalls in staffing result in hiring of "pre-academy" officers, unmanageable supervision loads for first line supervisors, and insufficient staff on some shifts to make required safety checks. The Monterey County Board of Supervisors accepted the report by unanimous vote on June 19, 2007.

20.     At the request of Defendant Miller, the independent assessment was updated in 2011 and found that County of Monterey physical facilities and their policies and practices for delivering medical treatment remained inadequate. The 2011 Assessment similarly found that the Jail's "Medical/mental health treatment spaces are not adequate for the rated beds, let alone the actual number of inmates held" and therefore prevent adequate delivery of medical health care. (Ex. 2, Executive Summary at 3.) The 2011 Assessment further noted the direct impact on overcrowding on prisoners' overall health, stating that "Overcrowding affects inmates' mental and physical health by increasing the level of uncertainty with which they regularly cope." (Ex. 2, Executive Summary at 9.)

21.     The Assessment also found that chronic understaffing hinders the County of Monterey's ability to provide medical care, classify and move inmates within the facility, maintain inmate safety and security, and transport inmates to and from outside agencies. (Ex. 2, Executive Summary at 6, 8.)

22.     Both the 2007 Needs Assessment and the 2011 Jail Needs Assessment concluded that, "[t]he current combination of insufficient beds, an inadequate detention facility and understaffing has resulted in an almost untenable situation." (Ex. 1, Executive Summary at 1–2, A.3; Ex. 2, Executive Summary at 2, A.2.)

23.     Much of the 2011 Assessment's findings were confirmed in a 2013 draft report by an expert hired by the County of Monterey, Dr. Richard Hayward ("Hayward Report"). (See Ex. 3.) The County tasked Dr. Hayward with evaluating mental health care at Monterey County Jail in response to a federal class action lawsuit challenging Monterey County's provisions of medical and mental health care at the Jail. See Hernandez v. Cnty. Of Monterey, No. 13-cv-2354-PSG (N.D. Cal. Filed May 23, 2013). The Hayward Report, dated December 6, 2013, identified serious deficiencies in the delivery of medical health care at the Monterey County Jail, including inmates not receiving responses to their written health requests. According to the Hayward Report, "the current procedures lack a systematic method of auditing receipt of and responses to all inmate requests for health services." (Ex. 3 at 3.)

24.     Further, according to the allegations contained in the Hernandez v. County of Monterey complaint (Ex. 4), the Jail fails to:

        a.     Provide medically necessary treatments for prisoners upon their arrival at the Jail (Ex. 4 at 42–43, 52–55);

        b.     Provide adequate care in emergency situations (Ex. 4 at 55–59);

        c.     Provide adequate diagnostic care to prisoners, including failing to appropriately refer prisoners to outside specialists when necessary (Ex. 4 at 59–61);

      d.    Provide post-operative and other medically necessary follow-up care to prisoners (Ex. 4 at 61–64); and

      e.    Maintain adequate, accurate, and complete medical care records (Ex. 4 at 64–67).

25.    Moreover, on April 15, 2013, County of Monterey was again specifically put on notice of the serious problems with its delivery of constitutionally adequate health care in the jail as well as its failure to protect prisoners from harm in a letter sent to the County from counsel for plaintiffs in Hernandez v. County of Monterey. (See Ex. 5 at 4–8.) These problems include inadequate screening processes for identifying prisoners with serious and chronic medical issues, refusal to continue treatment prisoners were already prescribed, imposition of punitive "detox" procedures that deny prisoners their prescribed pain medications, and denial of necessary treatment to prisoners to avoid the expense of such treatment. (Id. at 6–7.) The letter also identifies the Jail's overcrowding and understaffing as reasons why prisoners are not protected from harm when incarcerated. (Id. at 8.)

26.    As of the date of this filing, at least three inmates of Monterey County Jail have died in the custody of Monterey County officials in 2014, including Jacob Parenti. See Allison Gatlin, "Third inmate this year dies in Monterey County Jail," THE SALINAS CALIFORNIAN, Oct. 27, 2014, available at http://goo.gl/ky5Gve.

## II.   Jacob Parenti's Death

27.    Jacob Parenti was born in Aromas, California, in 1980. In 1982, his family moved to Monterey, California.

28.    Mr. Parenti is described by those who knew him as an unusually thoughtful, personable, and caring individual, who took time to listen and connect with others.

29.    He attended public school in Monterey, California, where he excelled in golf. Although he did not graduate from high school, he earned his GED.

30.    Mr. Parenti lived primarily with his mother, Susan Parenti, and father, Phil Parenti, until his father passed away when Jacob Parenti was approximately eighteen years old.

31.    During a portion of his teen years, and after his father passed away, Jacob Parenti lived with his half-sister, Amy Vye (née Parenti), and half-brother, Americo Parenti, who are thirteen and ten years older than Jacob, respectively, and with whom he was very close.

32.    After Mr. Parenti's son, D.P-O., was born in 2007, D.P-O. lived with his birth mother in San Luis Obispo.  Mr. Parenti had an ongoing relationship with D.P-O., making child support payments and regular visits when possible to spend time with D.P-O. in San Luis Obispo.  Mr. Parenti also brought D.P-O. to spend time with his family, including his sister, Amy Vye, and his older cousin, Matthew Oberholtz, with whom Mr. Parenti was also very close.

33.    In 2012, Mr. Parenti was the property manager for a residential property in Monterey.  In this capacity, he restored the property, brought it up to code, and managed that residence.

34.    In late 2012, Mr. Parenti petitioned for custody of D.P-O. because D.P-O.'s birth mother was not able to provide a stable home for D.P-O.  Mr. Parenti wanted to ensure that his son was taken care of and provided a stable, healthy environment.  Mr. Parenti was aware of his own challenges, including struggling with substance addiction, and told his family members that he was not going to let what happened to him happen to his son.  Because of this self-awareness, before petitioning for custody of D.P-O., Mr. Parenti asked his cousin, Mr. Oberholtz, if he would be willing to provide a stable home for D.P-O. in the event Mr. Parenti was unable to do so.  Mr. Oberholtz lives in Butte County where he runs a waterski school for able bodied and disabled athletes, and has long been involved in coaching teams for paralympic athletes, including the U.S. paralympic waterskiing team.  Mr. Oberholtz agreed, and spent considerable time with Mr. Parenti and D.P-

O.

35.     At the beginning of 2013, Mr. Parenti and Mr. Oberholtz jointly attended a court hearing at which Mr. Parenti was awarded primary custody of D.P-O.  Mr. Parenti brought D.P-O. to Monterey to live with him there, and enrolled D.P-O. in school and extracurricular activities.

36.     In February 2013, Mr. Parenti was charged with a probation violation for which he was given a three month sentence.  In order to ensure that D.P-O. would have as much stability as possible, and not continue to be placed in and out of different homes and schools, Mr. Parenti asked Mr. Oberholtz to assume guardianship of his son at this time.  D.P-O. moved to live with Mr. Oberholtz in Oroville, California.

37.     After Mr. Parenti was released from custody in April 2013, he was employed at a medical marijuana farm, and was interviewing for a position with the Sign and Display Union, which sets up and takes down displays at the Moscone Center.  In addition to his position as property manager, he had also previously worked in computer repairs and as an assistant foreman for an asphalt and seal coating company.

38.     Mr. Parenti also regularly helped his mother, Susan Parenti, by doing household chores, making food for her, helping with car and computer maintenance, assisting her with physical tasks she was unable to complete because of disabilities following back surgery, including physically carrying her and otherwise helping her to move around the house, and acting as her caretaker with respect to some of her medical and physical needs.

39.     In mid-2013, Mr. Parenti was charged with a probation violation for possessing a small amount of marijuana as part of a vehicle stop on his way home from work.  On information and belief, Mr. Parenti was offered a choice between a one-year jail term, after which, he would no longer be on probation, or a two-year extension of his probation.  Mr. Parenti chose the jail term because he wanted to be

1  able to move up to Butte County to live near D.P-O., and an extended probation

2  term would delay his ability to move because the conditions of his probation

3  restricted residency to Monterey County.

4    40. Mr. Parenti began the one-year jail term for this probation violation at

5  Monterey County Jail on or around August 1, 2013.

6    41. Mr. Parenti actively maintained a relationship with his son while he

7  was in Jail, including writing letters and cards to him in which Mr. Parenti told D.P-

8  O. how much he loved him and that he was proud of him.

9    42. Mr. Parenti also maintained relationships with his other family

10  members while he was in Jail, including his mother, sister, brother, and other

11  family.  He spoke with them regularly by telephone and exchanged letters with

12  them.  He also wrote to his six year-old niece, Ms. Vye's daughter, sending her

13  special birthday and holiday cards.

14    43. Mr. Parenti was housed in the D-wing dormitory of Monterey County

15  Jail, which is a medium security unit and houses approximately 90-100 men in a

16  dorm setting, with bunk beds and tables.

17    44. Throughout the first months of his incarceration, Mr. Parenti informed

18  his mother that the Jail was not consistently providing him his prescribed blood

19  pressure and psychotropic medications.  Susan Parenti called the Jail many times

20  and physically brought Mr. Parenti's medications to the Jail and handed them to a

21  nurse at the Jail in order to attempt to ensure that Mr. Parenti received his

22  medications.

23    45. On or around January 10, 2014, Mr. Parenti developed flu-like

24  symptoms.  He followed the Jail's procedures for seeking medical care and put in a

25  sick call request by filling out a written request, and placing it in the front gate of

26  D-wing.  On this sick call slip, Mr. Parenti wrote "have the flu."

27    46. Around the same time period, Mr. Parenti began coughing up blood.

28  / / /

COMPLAINT FOR DAMAGES  -10-

47.     Mr. Parenti did not receive a medical appointment in response to the sick call request he put in on January 10, 2014.  He put in another sick call request slip on or around January 12, 2014, following the above-described protocol.

48.     Mr. Parenti continued coughing up blood that was thick and mucous-like.  He was not called for sick call January 13 or 14, 2014.

49.     Early in the morning of January 15, 2014, at approximately 3:45 a.m., when the Jail provided D-wing inmates breakfast, Mr. Parenti was awake and alert, and interacting with other inmates.

50.     At around 9:45 a.m. on January 15, 2014, Defendant Collins stood at the gate of D-wing, where Mr. Parenti was housed, and called for several inmates to get dressed to see the nurse, including Mr. Parenti.

51.     Mr. Parenti was laying on his bunk and did not and could not respond even after Defendant Collins called his name multiple times.

52.     At that point, Defendant Collins entered D-wing, went over to Mr. Parenti's bunk, and said his name several more times.  Mr. Parenti remained unresponsive, although he was still breathing in a labored fashion.  Defendant Collins then repeatedly tapped and/or shook Mr. Parenti, but Mr. Parenti remained unresponsive.

53.     Deputy Collins then left D-wing without providing or summoning any medical attention for Mr. Parenti, despite the clear and apparent need for urgent medical treatment based on his inability to wake up Mr. Parenti and Mr. Parenti's submissions of requests for medical attention.

54.     Over the next hour, Defendants' officers and staff, including Deputy Collins and medical staff, failed, refused, and/or neglected to provide medical attention to an inmate in their custody in obvious and serious need of immediate medical attention. Neither Deputy Collins nor any other jail staff returned to check on Mr. Parenti or provide him with medical attention.

/ / /

55.     At approximately 10:45 a.m. that same morning, inmates in Mr. Parenti's housing unit noticed that he had stopped breathing and his face had a bluish tint.  Several inmates pulled him down from the bunk and attempted to resuscitate him while other inmates called "man-down" and attempted to get the attention of the deputies in the jail by banging on the gate of the unit.

56.     After one inmate had already started CPR on Mr. Parenti, deputies arrived in the unit, followed by Fire Department personnel and nurses.  On information and belief, the Jail deputies did not attempt CPR on Mr. Parenti.  At some point after they arrived, medical personnel made some attempt to resuscitate Mr. Parenti, but this was unsuccessful.

57.     At 11:05 a.m. on January 15, 2014, Mr. Parenti was pronounced dead.

58.     In the evening of January 15, 2014, Susan Parenti, Mr. Parenti's mother, received a phone call from an inmate at Monterey County Jail during which the inmate informed her that Mr. Parenti had died.  Ms. Parenti had not previously received any notification of her son's death from Monterey County Jail officers or other employees.

59.     On January 23, 2014, jail staff was quoted in a local newspaper as saying that Mr. Parenti died of a drug overdose.  On information and belief, at the time, the County had not yet received results of any toxicology report for Mr. Parenti nor had the Coroner's Office completed its autopsy report.

60.     Mr. Parenti's family raised funds and arranged for an independent autopsy of Mr. Parenti's body to be conducted.

61.     On January 24, 2014, the autopsy administrator for the independent autopsy notified the Coroner's Office that the family had arranged for an independent autopsy to be conducted for Mr. Parenti.

62.     Although the Monterey County Coroner's Report eventually concluded that Mr. Parenti died due to acute mixed drug intoxication, toxicology analysis of Mr. Parenti's blood does not support this conclusion.

63. Based on the findings of the independent autopsy, Parenti's death resulted from viral influenza syndrome complicated by pneumonia.

64. At the time of Mr. Parenti's death, the Monterey County Sheriff's Office and CFMG knew there to be a high prevalence of influenza in Monterey County, including the H1N1 flu virus.

65. News media reported that the Monterey County Sheriff's Office announced that another Monterey County Jail inmate died from influenza-related complications on or around January 20, 2014. According to news reports, that inmate was transferred from the Jail to a local hospital on January 12, 2104, after he complained of trouble breathing. On information and belief, that inmate had submitted multiple sick call slips before he finally received medical attention at the Jail.

66. Influenza and pneumonia are treatable medical conditions.

67. Defendants Monterey County and CFMG did not provide appropriate medical care to Mr. Parenti despite knowledge of viral influenza at Monterey County Jail and Mr. Parenti's self-report of flu-like symptoms.

68. With adequate, basic medical treatment, Mr. Parenti's death would have been avoided.

69. Defendants failed to provide appropriate urgent and emergency medical care to Mr. Parenti, despite his clear and obvious need for such treatment.

70. Had Defendants, including Defendant Collins, responded appropriately to Mr. Parenti's clear need for emergency medical attention on the morning of January 15, 2104, including seeking and providing such treatment to Mr. Parenti, his death would have been avoided.

71. Mr. Parenti's family members, including Plaintiffs Susan Parenti and D.P-O., as well as his sister, Amy Vye, and brother, Americo Parenti, have been deeply impacted by his untimely death and the circumstances thereof.

/ / /

COMPLAINT FOR DAMAGES                    -13-

72.    Plaintiff Susan Parenti, Mr. Parenti's mother, continues to experience emotional distress as a result of Mr. Parenti's death, the manner of his death, and the subsequent actions of Defendants, as well as loss of physical support from Mr. Parenti in performing activities of daily life in the context of her disabilities.

73.    Plaintiff D.P-O. lost his father, with whom he had a significant relationship before, during, and after the time period during which Mr. Parenti was D.P-O.'s primary caretaker.  Plaintiff D.P-O. lost both the future emotional and financial support of Mr. Parenti as a result of Mr. Parenti's death.

74.    While Mr. Parenti was housed in D-wing of the Jail, he made a significant impression on the men housed with him.  They describe him as friendly and caring, and as a person with a lot of positivity who always had a smile or a joke to tell if someone was having a bad day.

75.    After Mr. Parenti's death, some of the men in D-wing made a memorial for him, including a sketch of Mr. Parenti and a cross, and put it up on the wall of the Jail dormitory.  However, deputies at the Jail instructed them to remove the memorial, and withheld television, commissary, and visiting privileges until the men took down the memorial.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Deliberate Indifference to Serious Medical Needs and Failure to Protect from Harm in Violation of the Eighth and Fourteenth Amendments to the Constitution of the United States (Survival Action – 42 U.S.C. § 1983) (Against All Defendants)**

76.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 75 as though fully set forth herein.

77.    Defendants failed to provide Mr. Parenti with necessary and appropriate medical care.  They failed to adequately address Mr. Parenti's medical

needs up to and including this incident, and they failed to appropriately summon emergency medical care when Mr. Parenti was nonresponsive on January 15, 2014.

78.     Defendant Collins failed to respond appropriately to Mr. Parenti's emergency medical needs on January 15, 2014.

79.     Defendants County of Monterey, Miller, and CFMG failed to ensure that appropriate policies, procedures, and practices were in place to guide Defendant Collins in responding to medical emergencies, and filed to provide adequate training to Defendant Collins on response to medical emergencies.

80.     In addition to the individual failures enumerated above, Monterey County, Monterey County Sheriff's Office, and California Forensic Medical Group failed to adopt and implement adequate policies, procedures, training, and supervision to ensure the provision of appropriate medical care and emergency response in the Jail.

81.     Monterey County, Monterey County Sheriff's Office, Deputy Collins, and other jail staff had a duty to protect Mr. Parenti from harm, and failed to do so.

82.     Defendants have inadequate policies, procedures, and practices for identifying inmates in need of medical treatment and providing appropriate medical treatment. Defendants also fail to appropriately train and supervise staff regarding the regarding the provision of medical treatment to inmates.

83.     Defendants have consistently failed to meet their constitutional obligation to provide adequate medical treatment to prisoners in their jail. Defendants' failure to correct their policies, procedures, and practices, despite notice of significant and dangerous problems, evidences deliberate indifference in the provision of medical treatment.

84.     Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to provide Jacob Parenti with appropriate medical care, along with the acts and/or omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in order to identify medical need

and provide appropriate treatment, constituted deliberate indifference to Jacob Parenti's serious medical needs, health and safety.

85.     As a direct and proximate result of Defendants' conduct, Jacob Parenti experienced physical pain, emotional distress, and mental anguish, as well as loss of his life and other damages alleged herein.

86.     The aforementioned acts and/or omissions of Defendants Miller, in his individual capacity, Collins, CFMG, and Fithian were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Second Claim for Relief

### Deprivation of Substantive Due Process Rights in Violation of First and Fourteenth Amendments to the Constitution of the United States – Loss of Parent/Child Relationship (42 U.S.C. § 1983)

### (Against All Defendants)

87.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

88.     The aforementioned acts and/or omissions of Defendants in being deliberatively indifferent to Jacob Parenti's serious medical needs, health and safety, violating Mr. Parenti's constitutional rights, and their failure to train, supervise, and/or take other appropriate measures to prevent the acts and/or omissions that caused the untimely and wrongful death of Jacob Parenti deprived Plaintiffs Susan Parenti and D.P-O. of their liberty interests in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

89.     As a direct and proximate result of the aforementioned acts and/or omissions of Defendants, Plaintiffs suffered injuries and damages as alleged herein. / / /

COMPLAINT FOR DAMAGES                          -16-

90.     The aforementioned acts and/or omissions of Defendants Miller, in his individual capacity, Collins, CFMG, and Fithian were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**Third Claim for Relief**

**Failure to Furnish / Summon Medical Care**

**(Survival Action – California State Law)**

**(Against All Defendants)**

91.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 90 as though fully set forth herein.

92.     Defendants owed Jacob Parenti a duty of care to provide him immediate medical care.

93.     The conduct of Defendants alleged herein, including but not limited to the facts that Defendants knew or had reason to know that Jacob Parenti was in need of immediate medical care and that Defendants failed to take reasonable action to summon or provide that care, resulting in Jacob Parenti's death as alleged herein, violated California state law, including Cal. Govt. Code §§ 844.6 and 845.6.

94.     The alleged conduct of Defendants was committed within the course and scope of their employment.

95.     As a direct and proximate result of Defendants' breach, Jacob Parenti and Plaintiffs suffered injuries and damages causing great pain and leading to Parenti's death, as alleged herein.

96.     The aforementioned acts and/or omissions of Defendants Miller, in his individual capacity, Collins, CFMG, and Fithian were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**Fourth Claim for Relief**

**Negligent Supervision, Training, Hiring, and Retention**

**(Survival Action – California State Law)**

**(Against Defendants County of Monterey, Miller, CFMG, and Fithian)**

97.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 96 as though fully set forth herein.

98.    Defendants had a duty to hire, supervise, train, and retain employees and/or agents so that employees and/or agents refrain from the conduct and/or omissions alleged herein.

99.    Defendants breached this duty, causing the conduct alleged herein. Such breach constituted negligent hiring, supervision, training, and retention under the laws of the State of California.

100.   As a direct and proximate result of Defendants' failure, Jacob Parenti and Plaintiffs suffered injuries and damages as alleged herein.

**Fifth Claim for Relief**

**Negligence (Survival Actions – California State Law)**

**(Against All Defendants)**

101.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 100, as though fully set forth herein.

102.   Defendants failed to comply with professional standards in the provision of medical care to Jacob Parenti by failing to appropriately assess and evaluate his medical needs, failing to provide timely and emergency medical attention, failing to provide appropriate medical treatment, and failing to adopt the minimum policies, procedures, and training necessary to ensure identification of and response to of medical emergencies.

103.   These Defendants also failed to appropriately supervise, review, and ensure the competence of medical staff's and custody staff's provision of treatment to Parenti, and failed to enact appropriate standards and procedures that would have

COMPLAINT FOR DAMAGES          -18-

1   prevented such harm to him.

2       104.   Together, these Defendants acted negligently and improperly,

3   breached their respective duties, and as a direct and proximate result, Plaintiffs

4   suffered injuries and damages as alleged herein.

5       105.   The negligent conduct of Defendants was committed within the course

6   and scope of their employment.

7       106.   The aforementioned acts and/or omissions of Defendants Miller, in his

8   individual capacity, Collins, CFMG, and Fithian were willful, wanton, malicious,

9   and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive

10  damages to punish the wrongful conduct alleged herein and to deter such conduct in

11  the future.

12  **Sixth Claim for Relief**

13  **Wrongful Death – California Code Civ. Proc. § 377.60**

14  **(Against All Defendants)**

15      107.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through

16  106, as though fully set forth herein.

17      108.   Jacob Parenti's death was a direct and proximate result of the

18  aforementioned wrongful and/or negligent acts and/or omissions of Defendants.

19  Defendants' acts and/or omissions thus were also a direct and proximate cause of

20  Plaintiffs' injuries and damages, as alleged herein.

21      109.   As a direct and proximate result of Defendants' wrongful and/or

22  negligent acts and/or omissions, Plaintiffs incurred expenses for funeral and burial

23  expenses in an amount to be proved.

24      110.   As a direct and proximate result of Defendants' wrongful and/or

25  negligent acts and/or omissions, Plaintiffs suffered the loss of the services, society,

26  care, and protection of the decedent, as well as the loss of the present value of his

27  future services to his mother and son.  Plaintiffs are further entitled to recover

28  prejudgment interest.

COMPLAINT FOR DAMAGES          -19-

111.   The aforementioned acts and/or omissions of Defendants Miller, in his individual capacity, Collins, CFMG, and Fithian were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.   For compensatory, general and special damages against each Defendant, jointly and severally, in an amount to be proven at trial;

2.   For damages related to loss of familial relations as to Plaintiffs Susan Parenti and D.P-O.;

3.   Funeral and burial expenses, independent autopsy expenses, and incidental expenses not yet fully ascertained;

4.   General damages, including damages for physical and emotional pain, emotional distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness and trauma and suffering, the loss of the services, society, care and protection of the decedent, as well as the loss of financial support and contributions, loss of the present value of future services and contributions, and loss of economic security;

5.   Prejudgment interest;

/ / /

/ / /

/ / /

6.     For punitive and exemplary damages against each individually named Defendant in an amount appropriate to punish Defendant(s) and deter others from engaging in similar misconduct;

7.     For costs of suit and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and as otherwise authorized by statute or law;

8.     For restitution as the court deems just and proper;

9.     For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

Plaintiffs demand trial by jury in this action.

Dated: December 16, 2014              Respectfully Submitted,

RIFKIN LAW OFFICE

HADSELL STORMER & RENICK LLP


By:     /s/ Dan Stormer
         Dan Stormer
         Josh Piovia-Scott
         Mohammad Tajsar
         Attorneys for Plaintiffs