1
2
3
4

**UNITED STATES DISTRICT COURT**

5

**NORTHERN DISTRICT OF CALIFORNIA**

6

**SAN JOSE DIVISION**

7
8

JACOB PARENTI, ET AL.,

Case No. 14-cv-05481-BLF

9

Plaintiffs,

10

v.

**ORDER GRANTING IN PART AND DENYING IN PART DEPUTY COLLINS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

11

COUNTY OF MONTEREY, et al.,

12

Defendants.

[Re: ECF 100]

13
14

On January 15, 2014, Jacob Parenti ("Mr. Parenti") died in his dorm bed in the Monterey

15

County Jail where he was being held for a twelve-month term on a probation violation. The Estate

16

of Jacob Parenti, Mr. Parenti's minor son, and Mr. Parenti's mother (collectively, "Plaintiffs")

17

bring this action against the County of Monterey, Sheriff Scott Miller, and Deputy Timmy Collins

18

(collectively, "Defendants") asserting that Defendants were deliberately indifferent to Mr.

19

Parenti's serious medical needs in violation of his federal constitutional rights, and breached

20

duties owed to him under state law.[1]

21

Defendant Deputy Timmy Collins ("Deputy Collins") moves the Court for an Order of

22

Partial Summary Judgment on all causes of action in Plaintiffs' Complaint alleged against Deputy

23

Collins. *See* ECF 100 ("Mot."). The Court has considered the relevant evidence, applicable law,

24

oral argument presented at the hearing on November 9, 2017, as well as the briefing and

25

supplemental briefing of the parties. For the reasons that follow, Deputy Collins' motion for

26

partial summary judgment is GRANTED IN PART and DENIED IN PART.

27
28

---

[1] Defendants California Forensic Medical Group and Dr. Taylor Fithian ("CFMG Defendants") were dismissed from this action on October 5, 2017. *See* ECF 99.

# I.    BACKGROUND[2]

## A.    The Parties

Mr. Parenti was arrested and booked into Monterey County Jail on July 20, 2013 on a probation violation for possessing marijuana.  *See* Declaration of Johnathan Thornburg ("Thornburg Decl.") ¶ 3, ECF 100-3.  Mr. Parenti had been arrested and booked into the Monterey County Jail a total of seventeen (17) separate times between 2001 and 2013.  *Id.*

Deputy Collins is a 28-year veteran of the Monterey County Jail.  Declaration of Timmy Collins ("Collins Decl.") ¶ 2, ECF 100-1.  With respect to this lawsuit, Deputy Collins is alleged to be the last deputy to have seen Mr. Parenti alive.  On January 15, 2014, Deputy Collins was assigned to the Rehabilitation Unit building at the jail, where he had been assigned for the preceding ten years, since 2004. *Id.*  Specifically, on the day at issue, Deputy Collins was working the day shift and was assigned to the B/C Wing.  *See* Declaration of Janet L. Holmes ("Holmes Decl."), ECF 100-4, Exh D, Deposition of Timmy Collins ("Collins Depo.") 16:13-24; 19:11-19, 49:3-50:18; Collins Decl. ¶¶ 2, 4.

Deputy Collins testified that he knew Mr. Parenti because Mr. Parenti had been in and out of the Monterey jail over the years.  Collins Depo. 81:11-18.  Deputy Collins also knew that Mr. Parenti was not a drug smuggler or someone who was arrested for transportation or sale because Mr. Parenti was cleared to work in the kitchen.  *Id.* 81:19-82:14.  Deputy Collins recalled that Mr. Parenti was a "pretty decent worker," who didn't complain, was quiet, and stayed to himself, which Deputy Collins described as "a good thing."  *Id.*  In fact, Mr. Parenti was seen by jail staff as a "model inmate" who was polite, cooperative, quiet, and a good worker.  Collins Depo. at 82:15-18; 159:15-16; Declaration of Lori Rifkin ("Rifkin Decl."), Volume II, ECF 102-2 at 112, Deposition of William Taylor Fithian, M.D. ("Fithian Depo.") at 44:2-3.[3]  Other inmates described Mr. Parenti as friendly, well-liked and someone who helped others.  Rifkin Decl. Volume I, ECF 102-1, Declaration of Antonio Rappa ("Rappa Decl."), Exh. 200 ¶ 4; Declaration of Joshua

---

[2] The facts in this section are undisputed unless otherwise noted.
[3] Excerpts of Dr. Fithian's deposition testimony offered by Defendants are located in the record at Exhibit F to the Declaration of Janet L. Holmes, ECF 100-4.

Thomas Griffin ("Griffin Decl."), Exh. 202 ¶ 19; Declaration of Michael Christopher Wolfe ("Wolfe Decl.") Exh. 203 ¶ 25.[4]  Deputy Collins testified that he had never had an issue with Parenti using or possessing drugs in the jail.  Collins Depo. 159:5-16.  Deputy Collins further testified that he had no information about any of Mr. Parenti's medical issues.  *Id*. 115:8-12.

Dr. Taylor Fithian ("Dr. Fithian") was the staff psychiatrist and Medical Director with Defendant California Forensics Medical Group ("CFMG").  *See* Fithian Depo. 6:6-9.  The County of Monterey contracted with CFMG to provide medical and mental health services for inmates at the County Jail.  *See* Declaration of James Bass ("Bass Decl.") ¶ 3, Exh. A, ECF 100-2.[5]  As part of his duties, Dr. Fithian was partly responsible for policies and procedures, and for supervision of medical staff at the Monterey County Jail.  *See* Fithian Depo. 6:16-7:5.  Dr. Fithian was generally present at the Monterey County Jail on a daily basis from Monday through Friday during the relevant time period from 2013 to 2014.  *Id*. 20:7-15.  Under the procedures in place in December 2013 and January 2014, inmates could sign themselves up for a psychiatric "sick call" by filling out a slip.  *Id*. 8:20-24.  Mental health staff, custody staff, families and/or attorneys could also refer inmates for a "sick call."  *Id*. 8:20-9:11.  A "sick call list" would be generated for each housing unit at the jail, with medical sick calls separated from psychiatric.  *Id*. 16:13-25.

In early January 2014, Mr. Parenti filled out several sick slips, seeking treatment for various medical issues including a cancerous skin lesion on his nose, what he described on a slip as having the flu, and other requests to see the psychiatrist for adjustment of psychiatric medications.  Rifkin Decl. Volume I, Exh. 209 at 2-7.  On January 13, 2014, Mr. Parenti was seen by a nurse at the jail who prescribed him medication for a cold.  *See* Rifkin Decl. Volume II, Deposition of Maureen Hollcraft ("Hollcraft Depo.") at 64:19-69:5; Ex. 209 at 1, 8.  On January 14, 2014, Mr. Parenti reported increased anxiety and depression to a psychiatric nurse.  Rifkin Decl. Volume I, Exh. 209 at 8.  The nurse scheduled Mr. Parenti for a "routine psychiatric sick

---

[4] Along with Jace Esquivel, these three declarations are from inmates housed in the D-wing of the Rehabilitation Unit of the Monterey County Jail who knew Mr. Parenti and witnessed the events of January 15, 2014.
[5] At all relevant times, James Bass was employed by the County of Monterey Sheriff's Office as the Commander serving as the medical liaison with CFMG at the jail.  *See* Bass Dec. ¶ 2.

call" the next day with Dr. Fithian.  *See* Fithian Depo. 8:1-11, 23:22-24:5.

**B.**     **Rehabilitation Unit at Monterey County Jail**

Mr. Parenti was housed in "D-wing" at the Monterey County Jail, which is referred to as "dorm" or "pod" housing for approximately 85 men in bunk beds.  *See* Rifkin Decl. Volume I, Transcript of January 15, 2014 Interview of Deputy Collins ("Collins Interview 1/15/2014"), Exh. 207 at 2:2-6; Exh. 27A.  D-wing is part of a group of five housing pods comprising "Rehab 2,"— or the Rehabilitation Unit[6]—which includes wings B, C, D, E, and F.  *See* Rifkin Decl. Volume II, Deposition of Deputy Olio Guerrero ("Guerrero Depo.") 16:12-20:7, 26:16-27:4.  The layout of the Rehabilitation Unit where Mr. Parenti's dorm was located was essentially an octagon, with the Control 5 tower slightly elevated in the center and the various wings radiating out.  *See* Collins Depo. 101:5-16.  Four jail deputies oversaw the pods in Rehab 2, which encompassed the D-Wing: one "Control 5" deputy mans the control tower; two "hallway deputies" share responsibility for E and F pods and the yard; and one "B/C-wing deputy" is responsible for B, C, and D pods. Guerrero Depo. at 16:12-20:7, 26:16-27:4.  In 2014, responsibilities of the hallway and B/C-wing deputies included hourly "health and welfare checks" for each of their pods.  *Id.* at 26:16-27:4; Collins Depo. at 54:20-55:15, 105:13-19.  The B/C Wing deputy also monitored for safety and security, and provided assistance for appointments, escorts, and meals.  Collins Depo. 50:9-18.

On the day of Mr. Parenti's death, January 15, 2014, Deputy Collins was assigned to the position of B/C-wing deputy for the Rehab Unit.  *See* Rifkin Decl. Volume I, Exh. 25.  Deputy Collins had been assigned to the Rehab unit for the prior ten years.  Collins Depo. at 18:20-19:19. As for the rest of the team, Deputy Jimenez was on "control," and Deputies Guerrero and Gonzalez were the hallway deputies.  *See* Rifkin Decl. Volume I, Exh. 25; *see also* Guerrero Depo. at 16:5-23.

**C.**     **Deputy Collins' Interaction with Mr. Parenti on the Morning of January 15, 2014**

On the morning of January 15, 2014, Dr. Fithian asked Deputy Collins to assist him by

---

[6] "Rehabilitation Unit" does not refer to drug or alcohol rehabilitation programming, but refers to rehabilitation of sentenced inmates.  *See* Rifkin Decl. Volume II, Deposition of James Bass ("Bass Depo.") 24:9-26:5.

escorting inmates in the Rehabilitation Unit's C and D wings to inmate "sick call" visits with Dr. Fithian. Collins Depo. 86:3-14. Mr. Parenti was on the psychiatric sick call list for a visit with Dr. Fithian, but not for a medical emergency. Fithian Depo. 23:22-24:12. After Dr. Fithian completed his visits with inmates on the C wing, he asked Deputy Collins to accompany him to see people on the D wing, where Mr. Parenti was housed. Collins Depo. 85:21-86:10. At approximately 9:45 a.m., Deputy Collins went to the entrance of D-wing and called out the list of three or four people on the sick call list, including Mr. Parenti. *See* Wolfe Decl. ¶ 10; Collins Depo. 86:9-14. Mr. Parenti did not show up or respond. Wolfe Decl. ¶ 11; Collins Depo. 86:12-14. Deputy Collins called his name again. Collins Depo. 86:9-14. Kenny Packer, one of the other inmates in the D wing, told Deputy Collins that Mr. Parenti was sleeping. *Id*. 86:15-16.

Deputy Collins looked toward Mr. Parenti's bunk, and because no one was trying to wake him, Deputy Collins decided to go down the D-wing to check if Mr. Parenti wanted to see Dr. Fithian. *Id*. 86:19-23. As Deputy Collins walked down the wing, he could see Mr. Parenti lying on his stomach with his head facing the wall, and he testified that he could hear that Parenti was snoring. *Id*. 87:7-11. Deputy Collins testified that Mr. Parenti's snoring was not "raspy," but rather "sounded like normal snoring." *Id*. 93:20-23. Deputy Collins further testified that Mr. Parenti "didn't appear to be in any kind of distress. He was obviously breathing. He was snoring, which appeared to me as a normal breathing pattern." *Id*. 173:6-20.

According to Deputy Collins, he approached the bunk and tapped Mr. Parenti on the shoulder several times, and he was slow to wake up. *Id*. 87:7-14. Deputy Collins testified that Mr. Parenti turned his head toward Deputy Collins, and Collins asked him: "Do you want to see the doctor?" Collins Depo. 87:11-14. Deputy Collins testified that Mr. Parenti grumbled something in response, which Collins thought was okay because he was "actually sleeping pretty hard." *Id*. 87:15-19. Deputy Collins decided to let Mr. Parenti sleep. *Id*. 87:18-19. In contrast, the sworn affidavits of four inmate witnesses recall that Deputy Collins repeatedly shouted Mr. Parenti's name to try to wake him up and either "nudged," tapped, or shook him, but Mr. Parenti did not respond. *See* Wolfe Decl. ¶ 12; Griffin Decl. ¶ 11; Rappa Decl. ¶ 11; Rifkin Decl. Volume I, Declaration of Jace Esquivel ("Esquivel Decl.") ¶ 4.

Deputy Collins testified that he went back and told Dr. Fithian, who was standing at the door, "Yeah, he's sleeping pretty good." Collins Depo. 87:20-22. Dr. Fithian responded, "Okay. I'll come back later." *Id.* 87:23-24. Deputy Collins testified that it did not occur to him that Mr. Parenti was experiencing a medical difficulty when he did not wake up for Dr. Fithian's visit. *Id.* 133:9-14. Moreover, Deputy Collins testified that he did not find blood on Mr. Parenti's clothing or the sheets in his bunk, he had not heard of any evidence indicating there had been any such blood in the preceding 72 hours, and he was not told by any inmate that they had previously seen Mr. Parenti coughing up blood. *Id.* 173:21-174:7. Mr. Parenti did not cough during the interaction with Deputy Collins during the sick call rounds. *Id.* 173:6-20.

Other inmates in Mr. Parenti's housing unit observed that, in the days leading up to his death, Mr. Parenti was coughing and throwing up blood that was visible on his pillow. For example, Antonio Rappa testified that he observed Mr. Parenti throwing up blood in the shower at some point in January 2014. Rappa Decl. ¶ 6. Griffin testified that on January 12 or 13, 2015, a few days before his death, Mr. Parenti told Griffin that he was coughing up blood and showed Griffin blood on his pillow that was thick and mucous-like. Griffin Decl. ¶ 5. Wolfe testified that around January 9 or 10, 2014, Mr. Parenti told Wolfe that he was coughing up blood and showed him blood on his pillowcase that looked like it had tissue in it. Wolfe Decl. ¶¶ 5-7. Wolfe also testified that after Deputy Collins left the D-wing, at some time between approximately 10:20 and 10:35 A.M., Wolfe walked by Jake's bunk and "noted that he was breathing, but his breath was shallow." Wolfe Decl. ¶ 14.

### D. The "Man Down" Call

After Deputy Collins finished his medical escort duties with Dr. Fithian, Deputy Collins left the D-wing and returned to his regular duties as the B&C wing deputy. Collins Depo. 96:11-20; 50:5-53:4. Deputy Collins' B&C Wing Deputy station did not provide a sight line for the D wing because of a partition, so he could not observe Mr. Parenti. *Id.* 102:6-14. According to Deputy Collins, the control deputy and hallway deputies had the responsibility for monitoring the D-wing, including Mr. Parenti. *Id.* 102:21-103:8; 104:1-13.

Plaintiffs provide evidence that after Deputy Collins left D-wing, he was with the other

1  three deputies in the control tower.  *See* Rifkin Decl. Volume II, Deposition of James Bass ("Bass

2  Depo.") 26:10-27:9; Guerrero Depo. at 32:1-16.  Jail records show that no deputy performed the

3  hourly health and welfare check for the D-wing around the 10:00 a.m. hour on January 15, 2014.

4  Rifkin Decl. Volume I, Exh. 25 at 14; Bass Depo. at 116:2-5; Collins Depo. at 54:20-55:15,

5  105:13-19.[7]  Other inmates report that no deputy or jail staff returned to D-wing in the hour

6  following when Deputy Collins left Mr. Parenti sleeping on his bunk.  *See, e.g.*, Wolfe Decl. ¶ 16.

7       At approximately 10:40 a.m., other inmates noticed that Mr. Parenti did not appear to be

8  breathing and his face had turned a bluish tint.  *See* Rappa Decl. ¶ 16; Esquivel Decl. ¶ 6; Wolfe

9  Decl. ¶ 15; Rifkin Decl. Volume I, Exh. 63 at 3.  Several inmates pulled Mr. Parenti down from

10  his bunk onto the floor and attempted to resuscitate him while other inmates attempted to get the

11  attention of deputies by banging on the front gate of D-wing and yelling "man down." Rappa

12  Decl. ¶ 17; Esquivel Decl. ¶ 7; Wolfe Decl. ¶ 15; *see also* Griffin Decl. ¶ 12.  After Deputy

13  Collins checked in at Control Tower 5, he saw inmate Packer banging at the D-wing cage, which

14  is typically what the inmates would do if there was some sort of an emergency.  Collins Depo.

15  99:12-18.  Deputy Collins estimated that more than half an hour but less than an hour had passed

16  between the time Deputy Collins had been in the D-wing with Dr. Fithian and when he observed

17  the "man down" call from the control tower.  *Id.* 99:19-24.  Deputy Collins and Deputy Gonzalez

18  responded to the D-wing, where they found Mr. Parenti lying on the floor on his back on a

19  mattress, which could not be seen from the control tower.  *Id.* 99:25-100:11; Collins Interview

20  1/15/2014 at 3:2-5.

21       Although Deputy Gonzales assessed that Mr. Parenti was breathing, Deputy Collins

22  testified that he did not see Mr. Parenti's chest rise and fall so Deputy Collins reassessed and

23  determined that there was no breathing and no pulse.  Collins Depo. 106:1-107:1.  Deputy Collins

24  radioed Control 5 and advised them to "call 911." *Id.* 107:6-13.  Deputy Collins testified that he

25  and Deputy Gonzalez performed CPR on Mr. Parenti.  *Id.* 107:21-108:8; *see also* Collins

26

27  [7] Although Bass testified that the B&C wing deputy had responsibility over the D-wing, Collins
   testified that the hallway deputies were responsible for the D-wing with the exception of the
28  hourly checks, which the B&C wing deputy performed for D-wing.  *Compare* Bass Depo. 115:15-
   22 *with* Collins Depo. 105:13-25.

Interview 1/15/2014 at 3:17-6:9. In contrast, inmate Rappa attests that an inmate had already started CPR on Mr. Parenti by the time the deputies arrived, and the deputies did not attempt CPR. Rappa Decl. ¶ 19. However, inmate Griffin observed one of the deputies take over CPR when they arrived. Griffin Decl. ¶ 13. Wolfe testified that the deputies only performed chest pumps on Mr. Parenti, and did not attempt mouth-to-mouth resuscitation. *See* Wolfe Decl. ¶ 18. Griffin added that it took 5-10 minutes for the guards to arrive and then "seemed to take a long time" for the nurses to come and help Mr. Parenti. Griffin Decl. ¶¶ 13-14. Rappa recalled, "it did not seem as if [the deputies] were moving with any urgency or hurry. They seemed to be strolling." Rappa Decl. ¶ 18.

According to Deputy Collins, Nurse Gayle arrived quickly with an oxygen tank, and Deputy Collins assisted in putting the oxygen mask on Mr. Parenti to give him oxygen while Gonzalez continued with chest compressions. Collins Decl. 108:8-17. Dr. Banda and other medical staff arrived and Deputy Collins moved on to assist in relocating inmates away from the D-wing. *Id.* 108:18-21, 109:11-17. At approximately 11:00 a.m., personnel from the Fire Department and paramedics arrived. Rifkin Decl. Volume I, Exh. 63.

Mr. Parenti was pronounced dead at 11:05 a.m. on January 15, 2014. *See* Rifkin Decl. Volume I, Exh. 63 at 2. Defendant County of Monterey's autopsy and the independent autopsy obtained by Mr. Parenti's family came to different conclusions regarding the cause of death. *Compare* Rifkin Decl. Volume I, Exh. 63 *with* Exh. 210 at 4. The County's autopsy concluded that Mr. Parenti died from "acute mixed drug intoxication." Exh. 63 at 1. The autopsy from Mr. Parenti's family toxicology specialist found that Mr. Parenti died as a result of "viral flu syndrome complicated by pneumonia, sepsis, systemic inflammatory response syndrome, septic shock and multiorgan system failure." Exh. 210 at 4.

### E.    Plaintiffs' Claims Against Deputy Collins

In relevant part to this motion for partial summary judgment, Plaintiffs allege five causes of action against Deputy Collins in his individual capacity: (1) failure to provide medical care in violation of Eighth and Fourteenth Amendments pursuant to 42 USC § 1983; (2) deprivation of substantive due process in violation of the First and Fourteenth Amendments pursuant to 42 USC

8

§ 1983; (3) failure to furnish/summon medical care; (4) negligence; and (5) wrongful death.[8]  *See generally* Compl., ECF 1.

## II.    LEGAL STANDARD

### A.    Summary Judgment

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.* at 248–49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses.  *Id.* at 1103.  If the nonmoving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment.  *Celotex*, 477 U.S. at 323.  It is not the task of the Court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The

United States District Court
Northern District of California

---

[8] Plaintiffs' fourth cause of action for negligent supervision, training, hiring and retention is not alleged against Deputy Collins.  *See* Compl. ¶¶ 97-100.  Moreover, Defendants erroneously move for summary judgment as to the third cause of action under a § 1983 framework.  Although the caption of the Complaint mistakenly refers to § 1983 next to the third cause of action, the Complaint itself makes clear that the failure to furnish/summon medical care claim is brought pursuant to California state law, including violations of Cal. Govt. Code §§ 844.6 and 845.6. *Id.* ¶¶ 91-96.

Court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.; see also Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010). Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

"The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. However, "the 'mere existence of a scintilla of evidence in support of the plaintiff's position'" is insufficient to defeat a motion for summary judgment. *Id.* (quoting *Anderson*, 477 U.S. 242, 252 (1986)). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## B. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Wood v. Moss,* 134 S.Ct. 2056, 2066–67 (2014) (quoting *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2080 (2011)). "[T]he Supreme Court has 'repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991)). Under the applicable pleading standard, the plaintiff must allege facts sufficient to make out a plausible claim that it would have been clear to the defendant officer that his conduct was unlawful in the situation he confronted. *Id.* at 2067. "Because qualified immunity is an affirmative defense from suit, not merely from liability, '[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.'" *Doe By and Through Doe v. Petaluma City School Dist.,* 54 F.3d 1447, 1449–50 (9th Cir. 1995) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court set forth a two-part approach for analyzing qualified immunity. The analysis contains both a constitutional inquiry and an immunity inquiry. *Johnson v. County of Los Angeles,* 340 F.3d 787, 791 (9th Cir. 2003). The constitutional inquiry requires the court to determine this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier,* 533 U.S. at 201. If the Court determines that a constitutional violation could be made out based on the parties' submissions, the second step is to determine whether the right was clearly established. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. The Supreme Court has clarified that the *sequence* of analysis set forth in *Saucier* is not mandatory and that a court may exercise its sound discretion in determining which of the two prongs of the qualified immunity analysis to address first. *Pearson v. Callahan,* 555 U.S. 223, 241-42 (2009). Thus, in some cases, it may be unnecessary to reach the ultimate constitutional question when officers would be entitled to qualified immunity in any event, a result consistent with longstanding principles of judicial restraint.

The Supreme Court recently reiterated the longstanding principle that a "clearly established" constitutional right "should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *al-Kidd*, 563 U.S. at 742). Rather, it must be "particularized" to the facts of the case."*Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Defining the right at too high a level of generality "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Ricard*, 134 S.Ct. 2012, 2023 (2014). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741). "A right can be clearly established despite a lack of factually analogous preexisting case law, and officers can be on

notice that their conduct is unlawful even in novel factual circumstances." *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013). "The relevant inquiry is whether, at the time of the officers' action, the state of the law gave the officers fair warning that their conduct was unconstitutional." *Id.*

## III. DISCUSSION

### A. First Cause of Action Pursuant to 42 U.S.C. § 1983: Deliberate Indifference to an Inmate's Serious Medical Needs under the Eighth Amendment

Plaintiffs' first cause of action against all Defendants, including Deputy Collins, is a § 1983 claim for deliberate indifference to Mr. Parenti's serious medical needs and failure to protect him from harm in violation of the Eighth Amendment to the Constitution of the United States. *See* Compl. ¶¶ 76-86. Deputy Collins moves for summary judgment on the first cause of action alleged against him for his alleged deliberate indifference to Mr. Parenti's serious medical needs. *See* Mot. at 8-11. Plaintiffs oppose, arguing that Deputy Collins cannot carry his burden on summary judgment in light of the ample evidence from which a jury can conclude that Deputy Collins was deliberately indifferent. *See* Opp'n at 15. Deputy Collins further asserts that even if there is a triable issue on whether a constitutional violation occurred, he is entitled to qualified immunity under the second prong—that the right allegedly violated was not "clearly established" at the time of Deputy Collins' actions on January 15, 2014. Mot. at 11-15. Although he need only succeed on one prong to be shielded from liability, the Court finds that Deputy Collins is entitled to summary judgment under both prongs of qualified immunity.

### 1. Constitutional Violation

Under the first prong of qualified immunity, the Court considers whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. Plaintiffs argue that Deputy Collins violated Mr. Parenti's Eighth Amendment right to adequate treatment for his serious medical needs. Opp'n at 15. "The Eighth Amendment protects inmates from cruel and unusual punishment, which includes the denial of medical care." *Conn v. City of Reno*, 591 F.3d 1081,

1094 (9th Cir. 2009), *vacated*, 131 S. Ct. 1812 (2011), *reinstated in part and vacated in part*, 658 F.3d 897 (9th Cir. 2011). "Pretrial detainees, by contrast, are protected under the Due Process Clause of the Fourteenth Amendment." *Id.* "The Eighth and Fourteenth Amendments both guarantee that inmates and detainees receive constitutionally adequate medical and mental health care." *Conn*, 591 F.3d at 1094. Mr. Parenti was an inmate, rather than a detainee, at the time of his death on January 15, 2014, and thus the Court conducts the required analysis under the Eighth Amendment.

The Supreme Court has emphasized that, "[j]ust as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. 493, 510–11 (2011). To bring a valid § 1983 claim for a violation of Mr. Parenti's Eighth Amendment rights based on inadequate medical care, Plaintiffs must show that Deputy Collins' acts or omissions were "sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Hudson v. McMillian*, 503 U.S. 1, 4 (1992); *Jett v. Penner,* 439 F.3d 1091, 1096 (9th Cir. 2006).

Deliberate indifference has both an objective and a subjective component in order to rise to an actionable Eighth Amendment violation. *See Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002); *see also Labatad v. Corr. Corp. of Am.,* 714 F.3d 1155, 1160 (9th Cir. 2013). First, a plaintiff alleging deliberate indifference must "objectively show that [the inmate] was deprived of something 'sufficiently serious.'" *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013) (quoting *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009)). "A deprivation is sufficiently serious when the prison official's act or omission results 'in the denial of the minimal civilized measure of life's necessities.'" *Id.* (quoting *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970). Next, the plaintiff must "make a subjective showing that the deprivation occurred with deliberate indifference to the inmate's health or safety." *Lemire*, 726 F.3d at 1074. To satisfy the subjective component of deliberate indifference, Plaintiffs must show that Deputy Collins "knew of and disregarded" the substantial risk of harm. *Id.* The prison official need not have

13

1  intended harm: "it is enough that the official acted or failed to act despite his knowledge of a

2  substantial risk of serious harm." *Id.*

3          "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060

4  (9th Cir. 2004). A showing of medical malpractice or mere negligence is insufficient to establish a

5  constitutional deprivation under the Eighth Amendment. *Id.* Rather, deliberate indifference lies

6  "somewhere between the poles of negligence at one end and purpose or knowledge at the other."

7  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Under the deliberate indifference standard, the

8  prison official must not only "be aware of facts from which the inference could be drawn that a

9  substantial risk of serious harm exists," but that person "must also draw the inference." *Id.*

10  (quoting *Farmer*, 511 U.S. at 837). Liability may follow only if a prison official "knows that

11  inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable

12  measures to abate it." *Labatad,* 714 F.3d at 1160 (quoting *Farmer,* 511 U.S. at 847); *see*

13  *also Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) ("Deliberate indifference may be

14  reflected through either action or inaction such as denial, delay, or intentional interference with

15  medical treatment.").

16          The Supreme Court has explained that it is "fair to say that acting or failing to act with

17  deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of

18  recklessly disregarding that risk." *Farmer*, 511 U.S. at 836. "If a [prison official] should have

19  been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no

20  matter how severe the risk." *Id.* (quoting *Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1187

21  (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th

22  Cir. 2016)). Finally, Plaintiffs must also demonstrate that Deputy Collins' actions were both an

23  actual and proximate cause of Mr. Parenti's injuries. *See Conn*, 591 F.3d at 1098–1101; *see also*

24  *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1245 n.3 (9th Cir. 2010) (citing *White v.*

25  *Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990)).

26          Unsurprisingly, the parties have diametrically opposed views of what happened in the D-

27  wing at the Monterey County Jail's Rehabilitation Unit on January 15, 2014. Defendants describe

28  the events as a routine, non-emergency "sick call" to inmates who had requested or been referred

to the doctor, and a decision by a 28-year veteran deputy to let Mr. Parenti continue sleeping when he was found snoring in his bed. Plaintiffs' view of the facts is that Mr. Parenti was unresponsive when Deputy Collins tried to rouse him, and Deputy Collins violated protocol and callously left a helpless man to die in his jail bed, which amounts to deliberate indifference. On summary judgment, even under the qualified immunity analysis, the Court must believe Plaintiffs' evidence, and draw all reasonable inferences in their favor. Plaintiffs' "version of any disputed issue of fact is thus presumed correct." *Thomas v. Ponder*, 611 F.3d 1144, 1149 (9th Cir. 2010). The question before the Court on summary judgment is whether a genuine issue of material fact exists such there is a triable issue on whether Deputy Collins was deliberately indifferent to Mr. Parenti's serious medical needs.[9] *Id.*

Plaintiffs acknowledge that the "key issue" in this case is whether Deputy Collins had knowledge of Mr. Parenti's serious medical need on the morning of January 15, 2014, and his obligation to respond to that need. *See* Opp'n at 15-16. This is the subjective element of deliberate indifference, which requires a plaintiff to show that Deputy Collins "knew of and disregarded" the substantial risk of harm to Mr. Parenti. *Lemire*, 726 F.3d at 1074. Deputy Collins argues that there can be no § 1983 liability for deliberate indifference because there is no evidence that he had knowledge of an acute medical need of Mr. Parenti at the time of the "sick call" rounds with Dr. Fithian. Mot. at 10-11. Rather, Deputy Collins argues that it is undisputed that he had no medical information about Mr. Parenti, so when Mr. Parenti failed to respond after his name was called for a routine "sick call," Deputy Collins' decision to let him sleep—after he grumbled when Deputy Collins tapped his shoulder several times—was not deliberate indifference to a serious medical need. *Id.*

The Court agrees that Deputy Collins ignores a number of disputed facts in the record. For example, in contrast to Deputy Collins' testimony that he did not know that Mr. Parenti had any medical issues, in his interview shortly after Mr. Parenti's death on January 15, 2014, Deputy Collins recalled that Mr. Parenti had a medical problem and would go to sick call a lot. *See*

---

[9] As discussed below, even if a triable issue exists on the constitutional violation, Deputy Collins may still be entitled to qualified immunity if the constitutional right was not clearly established.

Collins Interview 1/15/2014 at 7:3-20. The four inmate witnesses also provide sworn affidavits that instead of just "tapping" Mr. Parenti on the shoulder, Deputy Collins actually shook Mr. Parenti and called his name loudly, but Mr. Parenti "did not respond." Rappa Decl. ¶ 11; Esquivel Decl. ¶ 4; Griffin Decl. ¶¶ 10-11; Wolfe Decl. ¶ 12.[10]

Although the Court considers these factual disputes and does not credit Deputy Collins' version of the facts at summary judgment, Plaintiffs have not shown that the evidence they provide supports facts material to the subjective component of deliberate indifference. There is simply no evidence in the record that Deputy Collins was subjectively aware of facts from which the inference could be drawn that a substantial risk of serious harm to Mr. Parenti existed, or that Deputy Collins actually drew the inference that such a risk existed. *Farmer*, 511 U.S. at 837. As laid out in the factual background above, the Court credits Plaintiffs' evidence that Deputy Collins called Mr. Parenti during the morning rounds for a sick call that Mr. Parenti had requested. There is evidence from several inmates that Mr. Parenti was laying unresponsive on his bunk and did not wake up even when Deputy Collins repeatedly called his name loudly from right next to him and shook him. *See* Wolfe Decl. ¶ 12; Griffin Decl. ¶ 11; Rappa Decl. ¶ 11; Esquivel Decl. ¶ 4. However, it is undisputed that Mr. Parenti was breathing during Deputy Collins' interaction with him, and the inmate witnesses do not dispute Deputy Collins' recollection that Mr. Parenti was snoring. *See* Rifkin Decl. Volume I, Transcript of February 4, 2014 Interview of Deputy Collins ("Collins Interview 2/4/2014"), Exh. 208 at 9:4-6. It is also undisputed that Mr. Parenti had been awake a few hours earlier that morning, when he had breakfast in the D-wing. Wolfe Decl. ¶ 9.

When Mr. Parenti did not respond to being called and shaken multiple times, Plaintiffs point to evidence that Deputy Collins left Mr. Parenti in his bunk and did not report his unresponsiveness to medical personnel or to his supervisors. In fact, Plaintiffs attempt to dispute

---

[10] The Court notes that three of the inmate witnesses also testified that Mr. Parenti showed them blood on his pillow or they observed Mr. Parenti coughing up blood in the days prior to his death. However, none of the witnesses testifies that there was blood on Mr. Parenti's pillow or that he coughed up blood on the morning in question during his interaction with Deputy Collins. *See, e.g.*, Rappa Decl. ¶ 6; Griffin Decl. ¶ 5; Wolfe Decl. ¶ 7. Accordingly, the Court cannot draw a reasonable inference from this evidence that there was blood in the bunk on the morning of January 15, 2014 such that it would have been sufficiently obvious to Deputy Collins.

Deputy Collins' testimony at his deposition in May 2016, when Deputy Collins "remembered" not only that Mr. Parenti "grumbled" something in response to his tapping (as opposed to just snoring, as previously reported), but also that Deputy Collins told Dr. Fithian that Mr. Parenti was "sleeping pretty good," and Dr. Fithian responded "okay, I'll come back later." Collins Depo. 87:7-24. The Court accepts the testimony of the inmate witnesses that Mr. Parenti "did not respond," to Deputy Collins that morning, and therefore Deputy Collins' testimony that Mr. Parenti "grumbled" a response is disputed. However, the Court finds that Deputy Collins' testimony that he told Dr. Fithian that Mr. Parenti was "sleeping pretty good," is undisputed.

Dr. Fithian himself does not remember anything about what happened on the morning in question, and does not recall "anything that Deputy Collins said about Jacob Parenti on the morning of January 15, 2014." Fithian Depo. at 25:15-26:9. Plaintiffs argue that Deputy Collins' account of the events surrounding Mr. Parenti's death changed over time from his initial interviews with investigators in January and February 2014, through his deposition on May 12, 2016, and again in his declaration signed September 29, 2017. Plaintiffs argue that a triable issue of fact exists because Deputy Collins did not initially report to investigators that he made any comment to Dr. Fithian when Mr. Parenti did not get up for sick call. *See* Collins Interview 1/15/14 at 8:14-25.[11]

After the hearing on Deputy Collins' motion for summary judgment, the Court ordered supplemental briefing on whether the discrepancies in Deputy Collins' recollection of events over the years constitutes evidence of disputed facts that the Court must consider on summary judgment. Plaintiffs argue that Deputy Collins' omission of his comment to Dr. Fithian in his 2014 interviews is materially inconsistent with Deputy Collins' deposition testimony and

---

[11] Plaintiffs mischaracterize the interview transcript in their opposition, stating that Deputy Collins "reported" to Nurse Maureen that Mr. Parenti changed his mind about going to sick call. *See* Opp'n at 5 (citing Collins Interview 1/15/14 at 9:3-8). Rather, this portion of the interview transcript is in response to the investigator's question: "[W]ho does [Mr. Parenti] report that to if he's not going to go [to sick call]?" to which Deputy Collins responded: "To the nurse. To the nurse that's doing sick call. And I think this morning it was Nurse Maureen." Collins Interview 1/15/14 at 9:3-6. Thus, this portion of the interview discussed who Mr. Parenti would have reported to if he did not want to go to sick call, and says nothing about what was actually reported to medical staff on the day in question.

declaration years later.  *See* Plaintiffs' Supplemental Brief at 2, ECF 105.  Plaintiffs urge the Court

to consider these omissions as prior inconsistent statements that raise a factual issue precluding

summary judgment.  *Id.*  The Court is not persuaded, because Deputy Collins' deposition

testimony is not "internally inconsistent" with his earlier reports to investigators.  Plaintiffs point

to no questions or responses from those interviews where an investigator elicited information from

Deputy Collins regarding what he said to Dr. Fithian.  It is not enough that Deputy Collins did not

volunteer such information in the earlier interviews.

Even accepting Deputy Collins' first two interviews with investigators as true, no

reasonable jury could find a contradiction between Deputy Collins' interview responses and his

later testimony that he told Dr. Fithian that Mr. Parenti was "sleeping pretty good," after he was

unable to rouse Mr. Parenti.  Accordingly, there is no genuine factual dispute on this point.

Plaintiffs impermissibly ask the Court to make a credibility determination at summary judgment.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202

(1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion

for summary judgment or for a directed verdict."); *see also House v. Bell*, 547 U.S. 518, 559–60,

126 S. Ct. 2064, 2089, 165 L. Ed. 2d 1 (2006) ("[T]he district court does not assess credibility or

weigh the evidence, but simply determines whether there is a genuine factual issue for trial.")  In

any event, the Court finds that this factual dispute is immaterial to the issue at hand.  Even if

Deputy Collins never told Dr. Fithian that Mr. Parenti was asleep, it does not create a triable issue

on deliberate indifference, because there is no evidence that Deputy Collins had knowledge of a

risk of harm to Mr. Parenti.

Deputy Collins also testified that he was trained in responding to medical issues in jails,

including identifying a potential overdose or medical emergency.  *See* Collins Depo. at 62:19-

65:20, 71:3-72:11.  Yet there is no evidence that Deputy Collins was aware of an overdose or a

medical emergency when he interacted with Mr. Parenti on January 15, 2014.  On the day of Mr.

Parenti's death, however, Deputy Collins was aware that two inmates in the D-wing of the jail had

overdosed in January 2014 alone, and that Mr. Parenti was a "casual drug user" based on the

charges he was in jail for. *Id.* Collins Dep. at 80:3-14, 81:11-24, 82:19-25. Yet Plaintiffs also submit evidence from their independent autopsy and toxicology specialist concluding that Mr. Parenti's death was not the result of having any drugs in his system. *See* Exh. 210 at 4. It is not reasonable to infer from Plaintiffs' evidence that deputies had the obligation to wake up every sleeping inmate to ensure he is not sick or suffering from an overdose. Deputy Collins' knowledge of this general information in the D-Wing is immaterial to his awareness of a serious risk to Mr. Parenti's medical needs that morning. The Court finds that there is no evidence that Deputy Collins would have had a heightened awareness that Parenti was on drugs or was suffering from a medical emergency when he did not wake up for a psychiatric sick call.

Plaintiffs also point to the testimony of Captain Bass, Defendants' Rule 30(b)(6) witness, who stated that when an officer finds an inmate who may be unconscious, the officer is trained to secure the scene, call for more advanced medical personnel, and check for signs of life. Bass Depo. 48:14-49:12. According to Captain Bass, the first step in checking for signs of life is "[t]rying to arouse them." *Id.* 49:7-12. However, there is no evidence in the record that Mr. Parenti was unconscious at the time Deputy Collins approached his bunk—or more importantly, that Deputy Collins had awareness that he was unconscious—only that Mr. Parenti was sleeping, snoring, and unresponsive to several attempts to wake him.

Even drawing all reasonable inferences from these facts in Plaintiffs' favor, there is no genuine dispute of material fact on the constitutional question of whether Deputy Collins was deliberately indifferent to Mr. Parenti's serious medical need. No reasonable jury could find that Deputy Collins acted with deliberate indifference by denying, delaying, and interfering with Mr. Parenti's medical treatment because there is no evidence upon which a jury could conclude that Deputy Collins was subjectively aware of a substantial risk to harm to Mr. Parenti and recklessly disregarded that risk.[12] *Clement v. Gomez* is instructive on the kind of evidence sufficient to send

_____

[12] Plaintiffs urge this Court to consider the decision in *Frary v. Cty. of Marin*, where the court found that triable issues existed based on similar factual circumstances. 81 F. Supp. 3d 811, 830 (N.D. Cal. 2015). In *Frary*, Deputy Hammer attempted to rouse an unresponsive, snoring inmate, and moved on without reporting his unresponsiveness despite several attempts to wake him. *Id.* at 829. The court concluded that a genuine dispute of material fact existed as to whether Deputy

the question of deliberate indifference to the jury. 298 F.3d 898, 904 (9th Cir. 2002). As discussed in detail below under the second prong of qualified immunity, *Clement* involved jail deputies who experienced the ill-effects of pepper spray—which was evidenced by the deputies taking turns stepping outside for fresh air, and coughing and gagging in the hall—and yet those deputies denied showers and medical attention to the inmates who the deputies knew had also been exposed to the pepper spray's harmful effects. *Id*. at 905. The Ninth Circuit concluded that such evidence was sufficient for the prisoners to survive summary judgment on the issue of whether the deputies were subjectively aware of the risk of serious injury to the prisoners. *Id.* In contrast, evidence of Deputy Collins' awareness of Mr. Parenti's condition is entirely lacking from this case.

For the foregoing reasons and drawing all inferences from the evidentiary record in favor of Plaintiffs, the Court finds that Deputy Collins is entitled to summary judgment on Plaintiffs' first cause of action because there is no triable issue on whether Deputy Collins was deliberately indifferent to Mr. Parenti's serious medical needs on the morning of January 15, 2014. Moreover, even if a triable issue on the constitutional question existed, Deputy Collins is shielded under the second prong of qualified immunity. *See White v. Pauly*, 137 S. Ct. 548, 551 (2017).

## 2. Clearly Established

Qualified immunity also protects government officials from liability for civil damages insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. at 551 (2017). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v.*

---

Hammer acted with deliberate indifference to the inmate's serious medical needs. *Id*. at 830. As explained at the hearing, *Frary* is not controlling law and it is also distinguishable because there was evidence that a trustee nearby commented to Deputy Hammer that the inmate "looks dead." *Id.* at 829. Here, there is no evidence that any inmate made a comment to Deputy Collins that would permit the Court to infer his awareness of a substantial risk of harm. In fact, when Deputy Collins asked the other inmates if Mr. Parenti "always slept like that," the response was "we don't know," and Deputy Collins said "well he's going to miss sick call." Rappa ¶¶ 12-14. Based on the undisputed facts in the record, no reasonable jury could find that Deputy Collins knew of and disregarded an excessive risk to Mr. Parenti's safety.

*Haugen,* 543 U.S. 194, 198 (2004). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. Although the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White,* 137 S.Ct., at 551 (internal quotation marks omitted). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

The Supreme Court has consistently told lower courts, and the Ninth Circuit in particular, that clearly established law should not be defined at a high level of generality. *See Kisela v. Hughes*, No. 17-467, 2018 WL 1568126, at *2 (U.S. Apr. 2, 2018) (quoting *City and County of San Francisco v. Sheehan,* 135 S.Ct. 1765, 1775–1776 (2015)); *see also White v. Pauly*, 137 S. Ct. at 552 (quoting *al-Kidd*, 563 U.S. at 742). Rather, clearly established law must be "particularized" to the facts of the case, otherwise the analysis "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Ricard*, 134 S.Ct. 2012, 2023 (2014). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.*

Further, the Ninth Circuit is unequivocal that the burden is on the *plaintiff* to point to case law indicating that the right allegedly violated was clearly established. "Except in the rare case of an 'obvious' instance of constitutional misconduct…Plaintiffs must *identify a case* where an officer acting under similar circumstances as [Officer Pfiefer] was held to have violated the Fourth Amendment." *Sharp v. County of Orange*, No. 15-56146, 2017 WL 4126947, at *7 (9th Cir. Sept. 19, 2017) (emphasis in original) (quoting *White*, 137 S.Ct. at 552). The preexisting law identified must also be "controlling—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a consensus of courts outside the relevant jurisdiction." *Id.*

As applied to this case, Deputy Collins argues that even if a triable issue exists as to a constitutional violation, qualified immunity shields him from liability if a deputy in his shoes could have reasonably believed his actions were legal in light of clearly established law and the

information he possessed at the time.  *See* Mot. at 12.  Even if a constitutional violation occurred, Plaintiffs have the burden to show that every reasonable officer would have known that Deputy Collins' conduct was unconstitutional under the circumstances.  *Thompson v. Rahr*, 885 F.3d 582 (9th Cir. 2018).  Even construing all evidence in favor of Plaintiffs, they have not carried their burden to show that the law was "clearly established" such that Deputy Collins had fair warning that his conduct was unconstitutional within the Supreme Court's parameters for qualified immunity.

"Although we must view the facts in the light most favorable to the nonmoving party, when considering qualified immunity, we are also limited to considering what facts the officer could have known at the time of the incident." *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017) (citing *White*, 137 S.Ct. at 550).  Ultimately, the Court asks "whether [Deputy Collins] would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor." *Estate of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017) (internal citation and quotation omitted).

As before, the Court resolves all factual disputes in favor of Plaintiffs.  The Court therefore does not credit Deputy Collins' disputed testimony that Mr. Parenti "grumbled" a response to him that Collins interpreted as a refusal to attend sick call.  Rather, the Court accepts Plaintiffs' evidence that Mr. Parenti did not respond when Deputy Collins walked over to Mr. Parenti's bunk and loudly called his name and shook him.  At that moment in time, Deputy Collins was aware that Mr. Parenti had a history of drug use and medical problems and was often on the sick call list.  Deputy Collins was further aware that two inmates in the same housing unit as Mr. Parenti had overdosed on drugs only a few days prior.  Deputy Collins was also trained on how to respond to overdoses and emergencies.  Yet after being unable to rouse Mr. Parenti, Deputy Collins did not alert any medical staff or supervisors to the fact that Mr. Parenti was unresponsive, and did not return to check on Mr. Parenti until he saw the "man down" call nearly an hour later.

With these facts in mind, Plaintiffs frame the qualified immunity analysis as follows: "whether, as of January 2014, the law was clearly established that a custody officer could not be

deliberately indifferent to an inmate in serious medical need and whether a reasonable officer would have known that it was a violation of this legal obligation to leave an inmate who was not responsive without summoning any medical provider, providing emergency response, or even coming back to check on the inmate within a short time period." Opp'n at 19. The Court finds that Plaintiffs have cast the constitutional right at too high a level of generality. It is not enough that the law "clearly establishes" that prisoners have the right to adequate medical treatment. Rather, it must be clearly established as of January 15, 2014, that a deputy could not leave a sleeping inmate with a history of drug use and medical problems who did not respond to being called and shaken for a non-emergency visit with a psychiatrist, without fully waking the inmate or notifying medical personnel or supervisors that the inmate was unresponsive.

Plaintiffs also incorrectly place the burden on Deputy Collins to cite to a case demonstrating that the right was *not* clearly established and that officers were not sufficiently on notice of their legal obligation to provide care to an unresponsive inmate. Opp'n at 19. The Ninth Circuit has made clear that the burden is on Plaintiffs. *Sharp*, 871 F.3d at 911 ("Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful.") (emphasis in original); *see also Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011) ("The plaintiff bears the burden to show that the contours of the right were clearly established.")

The Court has considered the cases offered by Plaintiffs to define the clearly established right, and finds that they have not met their burden. Plaintiffs cite to *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976), *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002), and *Estate of Prasad ex rel. Prasad v. Cty. of Sutter*, 958 F. Supp. 2d 1101, 1112-1113 (E.D. Cal. 2013). *See* Opp'n at 20. Plaintiffs also rely on *Frary v. Cty. of Marin*, 81 F. Supp. 3d 811, 828 (N.D. Cal. 2015). Opp'n at 20. However, *Frary* itself cannot clearly establish anything in this case, because it is not controlling precedent and it was decided *after* the events at issue took place on January 15, 2014.[13]

In *Estelle*, the plaintiff was an inmate in the Texas Department of Corrections who was

---

[13] To the extent that *Frary* holds that *Clement* clearly establishes the right at issue, this Court conducts its own analysis of *Clement* in light of Supreme Court guidance on qualified immunity.

injured when a bale of cotton fell on him while he was performing a prison work assignment to unload a truck. 429 U.S. at 99. He continued to work, but later sought medical treatment for back pain. *Id.* at 99-100. Jail staff ultimately concluded that plaintiff was able to work, and plaintiff was repeatedly disciplined for his refusal to work due to his injuries. *Id.* The Supreme Court held that even applying liberal standards for *pro se* litigants, the plaintiff's claims against the treating physician are not cognizable under section 1983. *Id.* at 107. The facts of *Estelle* are not at all "particularized" to the facts of this case such that they would put a reasonable officer in Deputy Collins' position that his conduct was unconstitutional. Rather, *Estelle* marks the Supreme Court's general conclusion that "deliberate indifference to serious medical needs of prisoners" is proscribed by the Eighth Amendment. *Id.* at 104.

*Clement* is similarly general, and does not clearly establish that Deputy Collins' conduct in this case was unconstitutional under the Eighth Amendment. In *Clement*, a violent fight erupted inside a prison cell, and the responding correctional officers administered several bursts of pepper spray when the inmates failed to respond to several orders and attempts to break up the fight. 298 F.3d 898, 901 (9th Cir. 2002). Inmates in neighboring cells claimed that the spray vapors drifted into their cells, injuring them. *Id.* Those inmates alleged that the officials were deliberately indifferent to their serious medical needs because they "were aware of the harmful effects of the pepper spray and of the inadequacy of their ventilation methods and yet purposefully refused to provide showers, medical care, or combative instructions or to develop an adequate policy to address obvious risks." *Id.* at 904.

The Ninth Circuit in *Clement* affirmed the district court's denial of summary judgment based on the officials' assertion of qualified immunity. *Id.* In examining the second prong of qualified immunity, the *Clement* court noted that "[t]he general law regarding the medical treatment of prisoners was clearly established at the time of the incident." *Id.* at 906 (citing *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992). The Ninth Circuit also relied on *Estelle* to find that it was also clearly established that the officers could not intentionally deny or

24

delay access to medical care. *Id.*[14]

The Court finds that *Estelle* and *Clement* are cast at too high a level of generality for the required qualified immunity analysis, and these cases do not put the constitutional question confronting Deputy Collins on January 15, 2014 "beyond debate." *See White*, 137 S.Ct. at 551. Importantly, in both cases, the defendants denied requested medical care for medical conditions they were aware of. Although "general statements of the law are not inherently incapable of giving fair and clear warning to officers," *id.* at 552, the general law that prisoners have the right to adequate medical treatment and that an officer's denial or delay in provision of that medical treatment violates the Eighth Amendment, does not amount to clearly established law in this case.[15]

At most, *Clement* clearly establishes that where officers know that pepper spray harmed inmates in neighboring cells who were bystanders to a fight, based on the officers own experience with the harmful effects of pepper spray, those officers are deliberately indifferent to serious medical needs by denying the inmates showers and access to medical care following the incident. 298 F.3d 898, 906 (9th Cir. 2002). *Clement* would not have alerted a reasonable official in Deputy Collins' position on January 15, 2014, that it would be unlawful to leave a sleeping inmate with a history of drug use and medical problems who did not respond to being called and shaken for a

---

[14] The third case cited by Plaintiffs, *Prasad*, is not controlling Ninth Circuit or Supreme Court authority and thus the Court need not consider it. *Sharp*, 2017 WL 4126947, at *7. Moreover, Plaintiffs do not demonstrate that *Prasad* forms a "consensus" with other court decisions amounting to clearly established preexisting law. *Id.* Regardless, *Prasad* is too factually dissimilar because it dealt with a pretrial detainee who was taken to see a doctor for emergency treatment, who discharged him with specific instructions to be returned to the emergency department if his symptoms worsened or new symptoms developed. 958 F. Supp. 2d at 1113. The defendant deputies were aware of this order and observed Prasad's condition worsen and develop, but did not return him to the emergency room. *Id.* The District Court for the Eastern District of California held that this amounted to deliberate indifference to Prasad's serious medical needs. *Id.* Even if *Prasad* represented controlling law, a reasonable deputy in Deputy Collins' position would not be on notice that letting Mr. Parenti sleep in a non-emergency situation violated clearly established law. *See Ford v. City of Yakima*, 706 F.3d at 1195 ("The relevant inquiry is whether, at the time of the officers' action, the state of the law gave the officers fair warning that their conduct was unconstitutional.")

[15] Plaintiffs also argue, without citing to any authority, that the County of Monterey's own policies and training put Deputy Collins on notice of his obligations to call for advanced medical personnel and trying to rouse Mr. Parenti in the situation he confronted. Opp'n at 20. The Court is unaware of any authority suggesting jail policies and procedures alone can amount to a clearly established statutory or constitutional right.

25

non-emergency visit with a psychiatrist, without fully waking the inmate or notifying medical personnel or supervisors that the inmate was unresponsive.  The Supreme Court's guidance in the years since *Estelle* and *Clement* has consistently told lower courts that they cannot define clearly established law at a high level of generality, and must evaluate the law under the particularized circumstances of the case.  *See Kisela*, 2018 WL 1568126, at *2 (quoting *Sheehan,* 135 S.Ct. at 1775–1776).

For the foregoing reasons, Plaintiffs have failed to meet their burden that the law was clearly established on January 15, 2014.  Accordingly, Deputy Collins is shielded by qualified immunity and his motion for partial summary judgment on the first cause of action is GRANTED.

**B.** **Second Cause of Action Pursuant to 42 U.S.C. § 1983: Deprivation of Substantive Due Process Rights to Familial Association under the Fourteenth Amendment**

Deputy Collins also moves for summary judgment on Plaintiffs' second § 1983 cause of action for a violation of substantive due process.  "The substantive due process right to family integrity or to familial association is well established." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011).  "A parent has a fundamental liberty interest in companionship with his or her child." *Kelson v. City of Springfield,* 767 F.2d 651, 654–55 (9th Cir.1985).  The violation of the right to family integrity is subject to remedy under § 1983. *Id.*  "Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013).  To amount to a violation of substantive due process, however, the harmful conduct must "shock the conscience" or "offend the community's sense of fair play and decency." *Rosenbaum*, 663 F.3d at 1079.

"Just as the deliberate indifference of prison officials to the medical needs of prisoners may support Eighth Amendment liability, such indifference may also rise to the conscience-shocking level required for a substantive due process violation." *Lemire*, 726 F.3d at 1075 (internal citation and quotations omitted).  The Ninth Circuit held in *Lemire* that "[a] prison official's deliberately indifferent conduct will generally 'shock the conscience' so as long as the prison official had time

26

to deliberate before acting or failing to act in a deliberately indifferent manner." *Id.* (citing *Tennison v. City and Cnty. of San Francisco,* 570 F.3d 1078, 1089 (9th Cir.2009); *Porter v. Osborn,* 546 F.3d 1131, 1138 (9th Cir.2008)).

Plaintiffs concede that their second cause of action under § 1983 rises and falls with the Eighth Amendment violation. *See* Opp'n at 22. As explained above regarding Deputy Collins' entitlement to qualified immunity on the Eighth Amendment violation, the Court finds that summary judgment is also appropriate on Plaintiffs' second cause of action for a substantive due process violation. There are no genuine issues of material fact as to whether Deputy Collins acted with deliberate indifference and thereby deprived Plaintiffs Susan Parenti and D.P-O. of their relationship with Mr. Parenti. Accordingly, no reasonable jury could conclude based on the evidence in the record that Deputy Collins' conduct "shocked the conscience." *Lemire*, 726 F.3d at 1075.

Deputy Collins' motion for partial summary judgment on Plaintiffs' § 1983 claim for loss of familial association is GRANTED.

### C. Third Cause of Action Pursuant to California State Law: Failure to Furnish/Summon Medical Care under California State Law

Deputy Collins analyzes Plaintiffs' first *three* causes of action against him under a deliberate indifference standard, referring to the framework for analyzing a § 1983 claim, when the Complaint only alleges two causes of action under § 1983. *See* Mot. at 8; *see also* Reply at 3, ECF 103. Although the caption of Plaintiffs' Complaint incorrectly listed the third cause of action for failure to furnish/summon medical care as a § 1983 claim, the Complaint itself is clear that the third cause of action is brought under state law. *See* Compl. ¶¶ 91-96. Plaintiffs identify their third cause of action as "Failure to Furnish/Summon Medical Care," indicating that it is a "Survival Action – California State Law" against "All Defendants." Compl. at 17. Specifically, Plaintiffs allege that "[t]he conduct of Defendants alleged herein, including but not limited to the facts that Defendants knew or had reason to know that Jacob Parenti was in need of immediate medical care and that Defendants failed to take reasonable action to summon or provide that care, resulting in Jacob Parenti's death as alleged herein, violated California state law, including Cal.

Govt. Code §§ 844.6 and 845.6." *Id.* ¶ 93.

Accordingly, the Court finds that Defendants have adequate notice of Plaintiffs' third cause of action against them, and Deputy Collins did not properly seek partial summary judgment on this claim. Instead, Deputy Collins only vaguely identifies the failure to furnish/summon medical care cause of action by erroneously grouping it with Plaintiffs' § 1983 causes of action without explanation. Mot. at 8 ("Plaintiffs' first three causes of action against Collins are analyzed under a deliberate indifference standard.") Deputy Collins also does not properly address the claim in his discussion of the state law causes of action, or in his reply after Plaintiffs raised this issue in their opposition. *See* Opp'n at 22 n.9; Reply at 3.

To the extent Deputy Collins moves for partial summary judgment on Plaintiffs' third cause of action for failure to furnish/summon medical care pursuant to California Government Code § 845.6, the motion is DENIED. The Court also finds that summary judgment is inappropriate on the third cause of action for the reasons discussed below regarding the state law causes of action.

### D. Fifth and Sixth Causes of Action Pursuant to California State Law: Negligence and Wrongful Death

Finally, Deputy Collins moves for summary judgment on Plaintiffs' fifth and sixth causes of action alleged against him for negligence and wrongful death in violation of California state law. *See* Mot. at 15-16. "Negligence is the failure to use reasonable care to prevent harm to oneself or to others" when there is a legal duty to use such care. *Coppola v. Smith*, 953 F.Supp.2d 993, 1013 (E.D. Cal. 2013). Jail and prison guards "generally have a duty to protect inmates from harm." *Harding v. City & Cty. of San Francisco*, No. C 10-04914 LB, 2012 WL 12540008, at *13 (N.D. Cal. Dec. 26, 2012), *aff'd*, 602 F. App'x 380 (9th Cir. 2015) (citing *Giraldo v. California Dept. of Corr. & Rehab.*, 168 Cal.App. 4th 231, 245 (2008)); *see also* Cal. Govt. Code §§ 844.6(d) and 820.8 ("nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission.") Negligence is a lesser standard than deliberate indifference and does not require that the public official has knowledge or even subjective awareness of a serious risk in order to be found liable. *Farmer*, 511 U.S. at 836.

As for the sixth cause of action, the elements of a California wrongful death claim are: "(1) a 'wrongful act or neglect' on the part of one or more persons that (2) 'cause[s]' (3) the 'death of [another] person.' " *Norgart v. Upjohn Co.,* 21 Cal.4th 383, 390 (1999) (quoting Cal. Civ. Proc. Code § 377.60). "A wrongful death claim may be predicated on negligence or other tortious conduct." *Prasad*, 958 F. Supp. 2d 1101, 1118 (E.D. Cal. 2013).

Deputy Collins argues that he is entitled to statutory immunity on the negligence and wrongful death claims under the immunity provided by California Government Code section 845.6. Mot. at 15; Reply at 8. That section provides in part that "[n]either a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody." Cal. Gov't Code § 845.6 (West). An exception exists "if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." *Id.*

"Liability of public entities and public employees under Government Code section 845.6 is limited to serious and obvious medical conditions requiring immediate care." *Lucas v. Cty. of Los Angeles*, 47 Cal. App. 4th 277, 288 (1996) (citing *Watson v. State of California*, 21 Cal.App.4th 836, 841 (1993)). Under California law, the duty of such public entities and officials to provide medical care to prisoners is limited to "cases where there is *actual or constructive knowledge* that the prisoner is in need of *immediate* medical care." *Id.* This is an objective standard. *Id.* "[S]ection 845.6 creates out of the general immunity a limited cause of action against a public entity for its employees' failure to *summon* immediate medical care only…The statute does not create liability of the public entity for malpractice in furnishing or obtaining that medical care." *Frary v. Cty. of Marin*, 81 F. Supp. 3d 811, 842 (N.D. Cal. 2015) (quoting *Castaneda v. Dep't of Corrs. & Rehab.*, 212 Cal.App.4th 1051, 1070 (2013), *review denied* (May 1, 2013)).

Deputy Collins essentially argues that the state law claims must fail for the same reasons that the section 1983 claims fail: because "[t]here is simply no evidence to establish that Deputy Collins denied, delayed or interfered with Parenti's medical treatment." Reply at 11. On this point, the Court agrees with Plaintiffs that *Frary* is instructive. *See* Opp'n at 24. In *Frary*, although the court found that summary judgment was appropriate against certain deputies because

1  section 845.6 does not impose a duty to monitor the quality of care provided, summary judgment

2  was denied as to Deputy Hammer based on evidence similar to the record in this case. 81 F. Supp.

3  3d at 842-43. Like Deputy Collins in this case, Deputy Hammer in *Frary* was not able to rouse an

4  inmate who had medical issues after repeatedly yelling and knocking loudly at his door. Deputy

5  Hammer took no action to summon medical assistance or to inform other deputies that the inmate

6  was unresponsive despite repeated knocking and yelling. With respect to section 845.6, the *Frary*

7  court held that "there is at least a triable issue of fact as to whether [Deputy Hammer] knew or had

8  reason to know that [the inmate] had an *immediate* medical need." *Id.*

9      Here, it is the "reason to know" language that differentiates Plaintiffs' state law causes of

10  action from the deliberate indifference standard analyzed above. Courts have construed the

11  "knows or has reason to know" element in 845.6 to include constructive notice. *See e.g. Lucas v.*

12  *Cnty. of L.A.,* 47 Cal. App. 4th 277, 288 (1996) (holding that the "reason to know" in § 845.6 is an

13  "objective standard" and finding that the duty to provide medical care under § 845.6 includes

14  "cases where there is actual or constructive knowledge that the prisoner is in need of immediate

15  medical care.") Although Plaintiffs have failed to demonstrate a triable issue of material fact with

16  respect to whether Deputy Collins was deliberately indifferent to Mr. Parenti's serious medical

17  needs, there is a triable issue with respect to whether Deputy Collins had "reason to know" of such

18  needs and could therefore be liable under state law. Summary judgment on the negligence and

19  wrongful death claims would therefore be inappropriate. [16]

20      A reasonable jury could conclude from Plaintiffs' evidence that Mr. Parenti's failure to

21  respond to being called and shaken was an indication of an immediate medical need, and that

22  Deputy Collins *had reason to know* of that need, but failed to take reasonable actions to summon

23  medical care. For these reasons, summary judgment on Plaintiffs' state law causes of action

24  against Deputy Collins is DENIED.

25

26  ────────────

27  [16] This analysis also serves as an independent basis for the denial of Deputy Collins' motion for summary judgment on the third cause of action for failure to furnish/summon medical care pursuant to Government Code sections 844.6 and 845.6.

28

**IV. ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that Deputy Collins' motion for partial summary judgment is:

    (1)    GRANTED as to Plaintiffs' first cause of action pursuant to § 1983 for deliberate indifference to Mr. Parenti's serious medical needs and failure to protect from harm in violation of the Eighth Amendment;

    (2)    GRANTED as to Plaintiffs' second cause of action pursuant to § 1983 for loss of the parent/child relationship in violation of the Fourteenth Amendment;

    (3)    DENIED as to Plaintiffs' third, fifth, and sixth causes of action for violations of California state law.

Dated:  April 6, 2018

BETH LABSON FREEMAN
United States District Judge